**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JASMIN ROLLING | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| WES HEALTH SYSTEM | : | NO.  25-1211 |

**MEMORANDUM**

**Padova, J.**                                                                                          **March 30, 2026**

Plaintiff, Jasmin Rolling, has brought this employment discrimination action pro se against her former employer, WES Health System.  Plaintiff asserts claims for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"); the Americans with Disabilities Act, 42 U.S.C. §§ 12112 et seq. (the "ADA"), and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq. (the "FMLA") based on actions that took place between May 2018 and May 2024.  Defendant asks us to dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(5) for failure to make proper service of process and pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  We grant the Motion for the reasons set forth below, dismissing some claims with prejudice and others without prejudice.

## I.    FACTUAL BACKGROUND

Plaintiff, who is African American, was employed by WES Health System for six years and first observed and personally experienced discrimination in May 2018.  (2d Am. Compl. at 3; Pl. Charge of Discrimination ("Charge"),[1] Docket No 10-1, at 1.)   The first instance of

---

[1] The allegations of fact underlying Plaintiff's claims are found the Charge of Discrimination that she filed with the Pennsylvania Human Relations Commission on December 9, 2024, and attached to the  Second  Amended Complaint.  (2d Am. Compl. at 3.)

discrimination that Plaintiff observed occurred when Defendant's BHRS Director,[2] Adrienne Harrison, was terminated in front of her team (including Plaintiff) shortly after she made several complaints to the Defendant's Vice President of Operations, Lynne Hopper, about a strong odor in the BHRS building.  (Id.)  The day after Harrison was fired, the City of Philadelphia's Department of Licenses and Inspections closed the BHRS building because Defendant's employees were being exposed to hazardous materials in that building.  (Id.)  Shortly thereafter, Plaintiff observed another instance of discrimination, when Hopper required Defendant's new BHRS Director, Dr. Khalil Shepard, to make Ryneesha Collins (who was supervised by Plaintiff) perform Therapeutic Support services that would expose her to physically aggressive children even though Collins was pregnant with a high risk pregnancy and those services were not part of her job.  (Id. at 2.)  Hopper and Shepard also tried to force Plaintiff to make Collins take on these duties, which harmed Plaintiff's relationship with Collins.  (Id.)

During the winter of 2018, Plaintiff personally experienced two instances of harassment. The first was connected to an incentive program that Hopper instituted in the fall of 2018, which was intended to allow clinicians in the BHRS department to obtain bonuses based on their hours billed.  (Id.)  In December 2018, WES Health System failed to pay the promised bonuses.  (Id.) Hopper told Plaintiff and the then new BHRS Director, Mike Lee, that the bonuses would not be paid because of mismanagement by WES Health System and directed Plaintiff and Lee to tell Defendant's employees about the problem.  (Id.)  This created tension between Plaintiff and the employees who had relied on the bonuses.  (Id.)  The second incident in the winter of 2018 occurred when Jeri Coleman, a program coordinator, walked into Plaintiff's office, pretended to drop a piece of paper near Plaintiff's desk, bent down to pick up the paper, "deliberately sniffed in between

---

[2] The Second Amended Complaint does not define BHRS.

[Plaintiff's] legs," left Plaintiff's office, and made a comment to another employee about an odor. (Id.)

In 2020, Plaintiff experienced discrimination connected to the birth of her first child. In April of that year, Plaintiff reached out to Lee and to Sharon Mackin and Antoinette Colon in the Human Resources Department to inform them that she would use FMLA leave for the birth of her first child. (Id.) Colon approved Plaintiff's leave to begin on June 13, 2020, and end on October 2, 2020. (Id.) On June 13, 2020, the day her leave was supposed to begin, Plaintiff received a text message from Colon instructing her to return to work because she had not submitted sufficient documentation to support her commencement of FMLA leave a month prior to her due date. (Id. at 2-3.) Colon harassed Plaintiff for a week before Lee intervened and allowed Plaintiff to begin her FMLA leave. (Id. at 3.) Colon's harassment of Plaintiff increased Plaintiff's stress levels and threatened her health and the health of her unborn child. (Id.)

Plaintiff returned to work from her FMLA leave on October 5, 2020. (Id.) Soon after she returned, Plaintiff participated in a staff training meeting held over Zoom. (Id.) During this meeting, Hopper told the participants that Plaintiff was very close to a former clinical supervisor for Defendant and hinted that this former employee was the father of Plaintiff's child. (Id.)

There was a transition in Plaintiff's department to an IBHS department[3] during the fall of 2020. (Id.) As part of that transition, Hopper gave five staff members new titles and promotions, which included higher wages, but did not offer the same to Plaintiff. (Id.) Three of the promoted staff members, a white man, a white woman, and a black woman, were personally close to Hopper. (Id.)

---

[3] The Second Amended Complaint does not define IBHS.

Approximately a year later, during the winter of 2021, Plaintiff began to experience medical issues, including hair loss, as a result of stress caused by discriminatory treatment at work. (Id.)  Plaintiff required a year of steroid injections in her scalp before her hair grew back.  (Id.)

Plaintiff earned her graduate degree in May 2023 and subsequently met with Hopper and Dr. Cornelius Ferguson to discuss career advancement and a promotion.  (Id.)  Hopper suggested that Plaintiff could take a post-doctoral fellow role that would have resulted in a significant pay cut and loss of seniority.  (Id.)  Plaintiff requested a position as a psychologist in Defendant's IBHS department.  (Id.)  Hopper declined Plaintiff's request and said that she would not allow Plaintiff to earn more than Dr. Ferguson, a white man and Hopper's neighbor.  (Id.)

In August of 2023, two IBHS Directors, Stephanie Thummel and Cierra Greene, complained about Plaintiff to Dr. Ferguson and, at their request, Plaintiff's status was changed from hybrid to completely in person.  (Id.)  Later that month, Plaintiff was diagnosed with a depressive disorder and placed on leave for six weeks by her doctor.  (Id. at 4.)  Plaintiff returned from medical leave in September 2023.  (Id.)

Beginning in October 2023 and continuing until Plaintiff left her employment with Defendant in April 2024, Plaintiff experienced a hostile work environment and discrimination which caused her to experience additional stress-related hair loss and two new medical conditions. (Id.)  Plaintiff was discriminated against during weekly two-hour staff meetings that she was required to attend with Hopper and the two IBHS Directors.  (Id.)  During these staff meetings, Plaintiff experienced excessive amounts of hostility and unprofessionalism.  (Id.) After the weekly staff meetings, Hopper and other attendees would speak negatively about Plaintiff in front of Plaintiff's office.  (Id.)  In addition, Hopper deliberately withheld information that Plaintiff needed to complete her job.  (Id.)  Hopper would also send Plaintiff "follow-up emails directing her to

complete different tasks than those required of others" and would tell the IBHS Directors to give Plaintiff other duties, resulting in severe miscommunication and mistrust within the department. (Id.)  Hopper and Thummel also ostracized Plaintiff, "shifted her responsibilities and reporting hierarchy, and tried to set her up to engage in unethical acts."  (Id.)  These actions caused Plaintiff stress, weight gain, and severe increases in blood pressure.  (Id.)

In April 2024, Plaintiff requested three days of paid time off ("PTO").  (Id.)  After Plaintiff resigned from her employment with Defendant in May 2024, Hopper deleted her PTO request from the time management system.  (Id.)  Also in May 2024, Colon told Plaintiff that she needed to pay tuition reimbursement funds to Defendant.  (Id.)  Although Plaintiff pointed out that Defendant's Employee Handbook stated that employees could use up to $50,000 before they would need to reimburse Defendant, Colon maintained that the $50,000 amount was a typo and that she would be required to reimburse Defendant.  (Id.)  Plaintiff refused to pay the tuition reimbursement and Colon initiated a reversal of her PTO payout.[4]  (Id.)  Plaintiff never received her PTO payout. (Id.)

Plaintiff believes that Hopper discriminated against her on behalf of her race and gender, noting that Hopper is white and has shown a preference to white individuals and to men.  (Id.) Plaintiff also believes, based on the manner in which Hopper treated her during her pregnancy, that Hopper discriminated against her on the basis of disability.  (Id.)  Defendant condones Hopper's racist, sexist, and ableist behavior.  (Id.)  The Second Amended Complaint alleges that Defendant violated Title VII, the ADA, and the FMLA by failing to promote her, failing to reasonably accommodate her disability, failing to stop its employees from harassing her, and subjecting her to

---

[4] The Second Amended Complaint does not explain this reference to "PTO payout" or state whether it is different from the three days of PTO that Plaintiff requested in April 2024.

unequal terms and conditions of employment, retaliation, and a hostile work environment.  (2d Am. Compl. at 2-3.)

Defendant has moved to dismiss the Complaint on two grounds.  It moves to dismiss the Complaint in its entirety for insufficient service of process pursuant to Federal Rule of Civil Procedure 12(b)(5).  It also moves to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on the ground that it fails to allege any claims upon which relief can be granted.

## II.    RULE 12(b)(5)

 "The rules of the state where a federal district court sits govern service of process."  Just Enters., Inc. v. O'Malley & Langan, P.C., 560 F. Supp. 2d 345, 351 (M.D. Pa. 2008) (citing Fed. R. Civ. P. 4(e)(1)).  In Pennsylvania, service of corporations is governed by Pennsylvania Rule of Civil Procedure 424.[5]  Rule 424 provides as follows:

> Service of original process upon a corporation or similar entity shall be made by handing a copy to any of the following persons provided the person served is not a plaintiff in the action:
>
> (1) an executive officer, partner or trustee of the corporation or similar entity, or
>
> (2) the manager, clerk or other person for the time being in charge of any regular place of business or activity of the corporation or similar entity, or
>
> (3) an agent authorized by the corporation or similar entity in writing to receive service of process for it.

Pa. R. Civ. P. 424.

The Affidavit of Service filed by Plaintiff in this case states that WES Health System was personally served by Shawn Schaffer of Legal Errands, Inc. on May 15, 2025, at 10:53 a.m., at 1315 Windrim Avenue, Philadelphia, PA, "[b]y handing documents to a manager/person in charge:

---

[5] The Pennsylvania Department of State identifies Wes Health Systems, Inc. as a domestic nonprofit corporation.  See https://file.dos.pa.gov/search/business; enter WES Health Systems in corporation look up box (last visited March 19, 2026).

Sanaa Kuttab, Executive Assistant to CEO." (Docket No. 15-1.) "[A] signed return of service generally creates a rebuttable presumption that service was validly performed." Babayoff v. Hazlet Manor Assocs., Nos. 22-1187, 22-1222, 22-1303, 2023 WL 1813489, at *2 (3d Cir. Feb. 8, 2023) (citing Gottlieb v. Sandia Am. Corp., 452 F.2d 510, 514 n.5 (3d Cir. 1971); Blair v. City of Worcester, 522 F.3d 105, 111 (1st Cir. 2008)) (add'l citations omitted). "A party may refute the presumption of valid service with sufficient evidence that service was not proper." Id. (citing Blair, 522 F.3d at 111-12) (add'l citation omitted). "In such a case, the district court acts as a factfinder to resolve the issue." Id. (citation omitted). "Ultimately, however, '[t]he party asserting the validity of service bears the burden of proof on that issue.'" Id. (alteration in original) (quoting Grand Ent. Grp. v. Star Media Sales, 988 F.2d 476, 488 (3d Cir. 1993)).

Defendant argues that "service of process [was] defective because it was handed to Sanaa Kuttab." (Def. Mem. at 6.) Defendant argues that handing process to Kuttab was improper because she "is the Executive Assistant to Pinnacle Network's Chief Operating Officer." (Id.) Defendant also states that Kuttab was not authorized to accept service of process for Defendant because "[s]he is not a manager, clerk, person in charge, [or] otherwise authorized to accept service of process on behalf [Defendant]." (Id.) Defendant relies on Kuttab's Declaration, which it submitted to the Court in support of this Motion. (See Docket No. 20.) Kuttab states in her Declaration that she is "currently employed by [Defendant] as the Executive Assistant to the Chief Operating Officer for Pinnacle Enterprise, Melanie Gray" and that "she work[s] at 1315 Windrim Avenue, Philadelphia, Pennsylvania." (Kuttab Decl. ¶ 1.) Kuttab also asserts in her Declaration that she works solely as the "Executive Assistant to the Pinnacle Network's Chief Operating Officer," Melanie Gray. (See id. ¶¶ 5, 6.)

We find that this argument is, at best, disingenuous.  It suggests that service was improper because its employee, Kuttab, worked only for an executive officer of Pinnacle Enterprise, not for an executive officer of Defendant.  However, a check of Defendant's website confirms that 1315 Windrim Avenue, Philadelphia, Pennsylvania is, indeed, Defendant's headquarters.  <u>See</u> https://weshealth.org/#:~:text=WES%20Health%20System%20is%20a%20trusted%20organizati on%20operated%20by%20experts,Culturally%20Competent%20Services (last visited Mar. 30, 2026) [https://perma.cc/K5DT-AT4T].  More importantly, the website identifies Melanie Gray, for whom Kuttab admits she worked, as being part of Defendant's "Executive Team."  <u>See</u> https://weshealth.org/meet-the-team (last visited March 26, 2026) [https://perma.cc/2JKC-Q6GN]. Defendant's website states that Ms. Gray is not only the COO of Pinnacle Enterprises, but is also Defendant's Vice President of Operations, public relations and community relations.  (<u>Id.</u>) Defendant's website also identifies Pinnacle Enterprises LLC as its real estate subsidiary.  (<u>Id.</u>) Ms. Gray likewise identifies herself in her LinkedIn profile as "COO at Pinnacle Enterprises LLC, WES Health System" and states that she "[m]anages all WES Health System facilities," and has been employed full-time by WES Health System since 1997.[6]  <u>See</u> https://linkedin.com/in/melanie-gray-8862955 (last visited March 19, 2026).  Accordingly, we deny the Motion with respect to Defendant's argument that service of process could not be

---

[6] Defendant's counsel would be well-advised to consider whether his signature on Defendant's Memorandum of Law and filing of both that document and the Kuttab Declaration comport fully with  Federal Rule of Civil Procedure 11 and Pennsylvania Rule of Professional Conduct 3.3.  Rule 11 states that by signing a motion, pleading, or other document, or by filing a document with the court, an attorney certifies that after reasonable investigation, the factual contentions in the document have evidentiary support.  <u>See</u> Fed. R. Civ. P. 11(b)(3).  Pennsylvania Rule of Professional Conduct 3.3 requires candor toward the tribunal.  <u>See</u> Pa. R. Prof. Conduct 3.3.  Both Rules appear to be implicated by the Memorandum of Law and the Kuttab Declaration, which  identify Ms. Gray solely as an executive officer of Pinnacle Enterprises (misidentified as Pinnacle Network) and fail to disclose that Gray is also an executive officer of Defendant

effectuated by handing the process to the executive assistant of Melanie Gray because  Gray is the COO of Pinnacle Enterprises when Gray is also identified in public documents and Defendant's own website as an executive officer of Defendant.

We have also considered whether service of process on the executive assistant of an executive officer of a defendant corporation is sufficient under Pennsylvania law.  The purpose of Pennsylvania Rule of Civil Procedure 424 "'is to satisfy the due process requirement that a defendant be given adequate notice that litigation has commenced.'"  Just Enters., Inc., 560 F. Supp. 2d at 352 (quoting Cintas Corp. v. Lee's Cleaning Servs., 700 A.2d 915, 919-20 (Pa. 1997)). "[C]ourts have been less concerned with the actual title of the person receiving service and more concerned that there 'be a sufficient connection between the person served and the defendant to demonstrate that service was reasonably calculated to give the defendant notice of the action against it.'"  Id. (quoting Cintas Corp., 915 A.2d at 920).  Pennsylvania courts "have therefore allowed service of process on a receptionist at a defendant's usual place of business, especially when the receptionist held him or herself out as in charge of the office."  Id. (citing Hopkinson v. Hopkinson, 470 A.2d 981, 987 (Pa. Super. Ct. 1984);  Cintas Corp., 700 A.2d at 920;  Farrell v. Bd. of Trustees, 269 A.2d 890, 892 (Pa. 1970); Knez Optical, Inc. v. Singer Optical Grp., Inc., Civ. A. No. 94-7582, 1995 WL 241428, at * 2 (E.D. Pa. Apr. 20, 1995)).  See also Knez Optical, 1995 WL 241428, at *2 (finding that defendants' receptionist and defendants' accountant/controller were both proper individuals to be served under Rule 424 because they were both employed by defendants and had frequent contacts with defendants); Grand Ent. Grp., Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 485 (3d Cir. 1993) (stating that "the secretary of a defendant may meet the statutory definition of a proper party to be served" but finding service of process to be insufficient where process was given to a receptionist who did not work for the defendant).

The Third Circuit has defined the phrase "a person for the time being in charge" (as used in Rule 424) as meaning "either 'an individual with some direct connection to the party to be served or one whom the process server determines to be authorized, on the basis of her representation of authority, as evidenced by the affidavit of service.'" C.O. v. Universal Health Servs., Inc., Civ. A. No. 24-4322, 2025 WL 564934, at *2 (E.D. Pa. Feb. 19, 2025) (quoting Grand Ent. Grp., 988 F.2d at 486). "The individual 'should either derive or appear to derive authority from the party upon whom service is attempted.'" Id. (quoting Grand Ent. Grp., 988 F.2d at 486) (citing Grieb v. JNP Foods, Inc., Civ. A. No. 15-1575, 2016 WL 8716262, at *3 (E.D. Pa. May 13, 2016)).

In this case, the process server handed process to Kuttab, who had a direct connection to Defendant, as she was employed by Defendant as an Executive Assistant to one of its executive officers. (See Kuttab Decl. at 1; https://weshealth.org/meet-the-team (last visited March 26, 2026) [https://perma.cc/2JKC-Q6GN].) The process server determined that Kuttab was authorized to accept service as a manager/person in charge of Defendant's headquarters. (See Docket No. 15-1.) While Kuttab states in her Declaration that she was not authorized to accept service of process on behalf of Defendant (id. ¶ 6), she does not state that she informed the process server of that fact. We conclude, accordingly, that Kuttab appeared to the process server to derive authority from Defendant to accept service on behalf of Defendant. See C.O., 2025 WL 564934, at *2 (quotations omitted); see also Belfor Prop. Restoration v. Ravenwood Manor, LLC, 305 A.3d 1085, 1090 (Pa. Super. Ct. 2023) (finding that service of process was proper where a sheriff's deputy handed the process to a security guard who was employed by the security company hired by the defendant to secure its property and the return of service stated that the deputy who served the process viewed the security guard as the person in charge of the property because the security guard was the only

10

individual on the property at 11:10 on a Tuesday morning and the security guard told the deputy that he would accept process and notify the defendant). We further conclude that Plaintiff has satisfied her burden of proving that service of process was sufficient in this case and we deny the Motion to Dismiss insofar as it argues that the Second Amended Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(5). Babayoff, 2023 WL 1813489, at *2 (quotation omitted).

### III.    RULE 12(b)(6)

####    A.    Legal Standard

When we apply Rule 12(b)(6), we "consider only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon [those] documents." Alpizar-Fallas v. Favero, 908 F.3d 910, 914 (3d Cir. 2018) (quoting Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010)). "A complaint is properly dismissed for failing to state a claim 'if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that [the] plaintiff's claims lack facial plausibility.'" Talley v. Pillai, 116 F.4th 200, 206 (3d Cir. 2024) (alteration in original) (quoting Warren Gen. Hosp. v. Amgen Inc., 643 F.3d 77, 84 (3d Cir. 2011)). "[W]e need not 'accept as true a legal conclusion couched as a factual allegation.'" Host Int'l, Inc. v. MarketPlace, PHL, LLC, 32 F.4th 242, 248 (3d Cir. 2022) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)) (citation omitted).

"A claim is plausible on its face 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Kalu v. Spaulding, 113 F.4th 311, 325 (3d Cir. 2024) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more

11

than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)). A complaint fails to allege a facially plausible claim if the factual allegations in the complaint are not sufficient "to raise a right to relief above the speculative level." Geness v. Admin. Off. of Pa. Cts., 974 F.3d 263, 269 (3d Cir. 2020) (quoting Twombly, 550 U.S. at 555). Since Plaintiff is proceeding pro se in this action, we construe the Second Amended Complaint "liberally and hold it 'to less stringent standards than formal pleadings drafted by lawyers.'" Kalu 113 F.4th at 325 (quoting Erickson v. Pardus, 551 U.S. 89, 94 (2007)) (citation omitted).

### B.    The Statute of Limitations

Defendant has moved to dismiss Plaintiff's claims to the extent that they are barred by the applicable statute of limitations. "A complaint is subject to dismissal for failure to state a claim on statute of limitations grounds only when the statute of limitations defense is apparent on the face of the complaint." Wisniewski v. Fisher, 857 F.3d 152, 157 (3d Cir. 2017) (citing Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014)).

#### 1.    Title VII and the ADA

To file suit under Title VII and the ADA, a plaintiff must file a charge of discrimination with the EEOC "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); see also 42 U.S.C. § 12117(a); Emmell v. Phoenixville Hosp. Co., LLC, 303 F. Supp. 3d 314, 325 (E.D. Pa. 2018) (citing Mandel v. M & Q Packaging Corp., 706 F.3d 157, 165 (3d Cir. 2013)). "'[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.'" Mandel, 706 F.3d at 165 (alteration in original) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002)). "A discrete act in itself constitutes a separate actionable unlawful employment practice."

12

Id. (citing Morgan, 536 U.S. at 114). "Discrete acts include, for example, 'termination, failure to promote, denial of transfer, or refusal to hire.'" Id. (quoting Morgan, 536 U.S. at 114). "An employer's denial of a request for a reasonable accommodation also constitutes a discrete act of discrimination" in violation of the ADA. Emmell, 303 F. Supp. 3d at 326 (citing Mercer v. Se. Pa. Transit Auth., 26 F. Supp. 3d 432, 442 (E.D. Pa. 2014), aff'd sub nom. Mercer v. SEPTA, 608 F. App'x 60 (3d Cir. 2015)). Plaintiff dual filed her charge of discrimination with the Pennsylvania Human Relations Commission and the EEOC on December 9, 2024 (see Charge at 1), so any Title VII or ADA claims based on discrete discriminatory acts that occurred before February 13, 2024, are time barred.

Plaintiff argues that her Title VII claims are not barred to the extent that they rely on incidents that occurred prior to February 13, 2024, because these incidents are part of a continuing violation of Title VII. The "continuing violation doctrine . . . allows courts to consider conduct that would ordinarily be time barred as long as the untimely incidents represent an ongoing unlawful employment practice." Morgan, 536 U.S. at 107 (quotation omitted). "Under the continuing violation doctrine, discriminatory acts that are not individually actionable may be aggregated to make out a hostile work environment claim; such acts 'can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period.'" Mandel, 706 F.3d at 165 (quoting O'Connor v. City of Newark, 440 F.3d 125, 127 (3d Cir. 2006)); see also Oliver v. Clinical Pracs. of Univ. of Pa., 921 F. Supp. 2d 434, 443-46 (E.D. Pa. 2013) (examining the application of the continuing violation doctrine to disparate treatment discrimination claims). "A hostile work environment claim 'is composed of a series of separate acts that collectively constitute one unlawful employment practice' and 'cannot be said to occur on any particular day.'" Mandel, 706 F.3d at 165 (quoting Morgan, 536 U.S. at 115-17). "To

13

allege a continuing violation, the plaintiff must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period." Id. at 165-66 (citing Morgan, 536 U.S. at 122) (add'l citation omitted).  When we consider whether these incidents are part of a continuing violation, we look at the subject matter and frequency of the actions alleged.  See Brown v. Tait Towers Mfg., LLC, Civ.  A. No. 21-4573, 2022 WL 206177, at *4 (E.D. Pa. Jan. 21, 2022) (citing Mandel, 706 F.3d at 166-67).  "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"  Morgan, 536 U.S. at 114.

None of the incidents that are alleged to have occurred prior to October 2023 are alleged to be connected.  Indeed, with the exception of Hopper's failure to promote Plaintiff, none of those incidents concern the same subject matter.  Moreover, Hopper's failure to promote Plaintiff in 2020 and refusal to promote Plaintiff in 2023 are clearly discrete acts that were separately actionable at the time that they occurred and thus are not part of a continuing violation.  See Morgan, 536 U.S. at 114.  The Second Amended Complaint does not describe the discriminatory conduct that Plaintiff alleges she suffered in the winter of 2021, so there is no way for the Court to determine whether that conduct was part of the same unlawful employment practice as any of the other alleged incidents.  Consequently, we find that the Second Amended Complaint does not plausibly allege that any of the incidents that are alleged to have occurred prior to October 2023 are part of a continuing violation, much less one that continued beyond February 13, 2024.  We therefore conclude that Plaintiff's Title VII hostile work environment and disparate impact claims are barred by the statute of limitations to the extent that they rely on incidents that are alleged to have occurred

14

prior to October 2023, and we grant the Motion to Dismiss with respect to Plaintiff's Title VII claims to the extent that they rely on conduct prior to October 2023.

In contrast, Plaintiff's claim that she was subjected to a hostile work environment beginning in October 2023 and continuing until she submitted her resignation in April of 2024, relies on allegations that she experienced continuing micromanagement, microaggressions, and discrimination in the form of hostility during and after staff meetings with Hopper and the IBHS Directors, conflicting work assignments, and ostracism by the IBHS Directors. (Charge at 4.) We find that the Second Amended Complaint plausibly alleges that these discriminatory acts are linked in that they allege similar conduct undertaken by the same individuals both prior to and during the limitations period. See Mandel, 706 F.3d at 165 (quotation omitted). We therefore deny the Motion with respect to Defendant's argument that Plaintiff's Title VII claims are barred by the statute of limitations to the extent that these claims rely on conduct that began in October 2023 and continued until Plaintiff left her employment with Defendant.

The Second Amended Complaint's claim that Defendant failed to accommodate Plaintiff's disability arises from Defendant's treatment of Plaintiff while she was pregnant. (See Charge at 4.) The only references to Plaintiff's pregnancy in the Second Amended Complaint pertain to Plaintiff's request for FMLA leave in April 2020, Colon's attempts to interfere with her use of FMLA leave in 2020, and Plaintiff's use of FMLA leave between June and October 2020. (Id. at 2-3.) As we noted above, "[a]n employer's denial of a request for a reasonable accommodation . . . constitutes a discrete act of discrimination." Emmell, 303 F. Supp. 3d at 326 (citation omitted). This discrete act is alleged to have occurred more than three years prior to February 13, 2024. We conclude, accordingly, that Plaintiff's ADA claim is barred by the statute of limitations, and we grant the Motion to Dismiss with respect to that claim.

15

2.    The FMLA

Defendant also contends that we should dismiss Plaintiff's claim for interference with her rights under the FMLA because her claim is barred by the FMLA's statute of limitations. "To assert a timely claim under the FMLA, a plaintiff must file suit no later than two years after the date of the last event constituting the alleged violation." Clark v. Phila. Hous. Auth., 701 F. App'x 113, 116 n.1 (3d Cir. 2017) (citing 29 U.S.C. § 2617(c)(l)). "The limitations period can be extended to three years if the violation is willful." Id. (citing 29 U.S.C. § 2617(c)(2)). The Second Amended Complaint alleges that Defendant interfered with Plaintiff's rights under the FMLA in June 2020, when Colon prevented Plaintiff from taking her FMLA leave for a week. (Charge at 2-3.) It does not allege any other attempt to interfere with Plaintiff's rights under the FMLA. Plaintiff commenced this action by filing a Complaint against Defendant on March 4, 2025, more than three years after June 2020. We conclude, accordingly, that Plaintiff's claim that Defendant interfered with her rights under the FMLA is barred by the FMLA's statute of limitations, and we grant the Motion to Dismiss with respect to Plaintiff's FMLA claim.

C.    Disparate Treatment Race and Sex Discrimination in Violation of Title VII

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "The elements of a *prima facie* case are the same for discrimination claims on the basis of sex and race." Tourtellotte v. Eli Lilly & Co., 636 F. App'x 831, 842 (3d Cir. 2016) (citation omitted). The Third Circuit has instructed that, in order to state a *prima facie* case of race or sex discrimination based on disparate treatment, "a plaintiff must first establish that:  (1) she is a member of a protected class; (2) she was qualified for the

position in question; (3) she suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination." Id. (citing Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999); Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 n.6 (1981)).

Defendant argues that we should dismiss Plaintiff's disparate treatment race and sex discrimination claims because the Second Amended Complaint fails to plausibly allege that Plaintiff suffered an adverse employment action. Plaintiff argues that the Second Amended Complaint alleges that she experienced an adverse employment action within the limitations period for her Title VII claims because it alleges that she was constructively discharged in April 2024. (See Charge at 1, 4.)

To plausibly allege constructive discharge, a complaint must allege that "'the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'" Mandel, 706 F.3d at 169 (quoting Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084 (3d Cir. 1996)). "The test is objective and looks to whether 'a reasonable person in the employee's position would have felt compelled to resign.'" Lewis v. Univ. of Pa., 779 F. App'x 920, 922 (3d Cir. 2019) (quoting Pa. State Police v. Suders, 542 U.S. 129, 141 (2004)). The Third Circuit "has identified various factors that support a claim of constructive discharge, including being 'threatened with discharge,' being 'urge[d] . . . [to] resign or retire,' being demoted, suffering a reduction in pay or benefits, being 'involuntarily transferred to a less desirable position,' having job responsibilities 'altered,' and being 'given unsatisfactory job evaluations.'" Id. (alterations in original) (quoting Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993)).

17

The Second Amended Complaint alleges that, beginning in October 2023 and continuing until Plaintiff resigned, Plaintiff experienced "hostility and unprofessionalism almost every time she made a comment, suggestion, or recommendation related to her position" in her required two-hour weekly staff meetings with Hopper and the IBHS Directors.  (Charge at 4.)  It also alleges that Hopper withheld information that Plaintiff needed to do her job; that Hopper sent Plaintiff emails directing her to complete different tasks than those required of others; that Hopper told the IBHS Directors to give Plaintiff other duties, resulting in miscommunication and mistrust within Plaintiff's department; and that Hopper and Thummel "repeatedly ostracized [Plaintiff], shifted her responsibilities and reporting  hierarchy, and tried to set her up to engage in unethical acts." (Id.)  The Second Amended Complaint also alleges that Hopper and the IBHS Directors talked negatively about Plaintiff outside of her office.  (Id.)  We find that the Second Amended Complaint plausibly alleges that the actions of Hopper and the IBHS Directors altered Plaintiff's job responsibilities and created an intolerable and abusive working environment to which "resignation qualified as a fitting response" and that Plaintiff's resignation was a constructive discharge.  Lewis, 779 F. App'x at 922 (quotation omitted).  We further find, accordingly, that the Second Amended Complaint plausibly alleges that Plaintiff suffered an adverse employment action.

Defendant also argues that the Second Amended Complaint fails to plausibly allege a claim of disparate treatment discrimination based on Plaintiff's race or sex because it does not allege that Plaintiff's constructive discharge "'occurred under circumstances that could give rise to an inference of intentional discrimination.'"  Mandel, 706 F.3d at 169 (quoting Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008)).  "An inference of discrimination 'could be supported in a number of ways, including, but not limited to, comparator evidence, evidence of similar . . . discrimination of other employees, or direct evidence of discrimination from statements or actions

18

by [Plaintiff's] supervisors suggesting . . . animus.'" Hornby v. Endless Mountain Behav. Health Ctr., Inc., Civ. A. No. 25-0465, 2025 WL 2713741, at *4 (M.D. Pa. Sept. 23, 2025) (alterations in original) (emphasis omitted) (quoting Golod v. Bank of America Corp., 403 F. App'x 699, 702 (3d Cir. 2010)) (citation omitted).  Evidence that the employee was replaced by someone outside of her protected class may also support an inference of discrimination.  See Edwards v. Albert Einstein Med. Ctr., 533 F. Supp. 3d 215, 222 (E.D. Pa. 2021) (citing Johnson v. Keebler-Sunshine Biscuits, Inc., 214 F. App'x 239, 242 (3d Cir. 2007)); see also Lazard v. All Restore, LLC, Civ. A. No. 19-6040, 2021 WL 1175137, at *7 (E.D. Pa. Mar. 29, 2021) ("In the Third Circuit, the fact that a plaintiff was replaced by an individual who is not a member of their protected class is sufficient to establish an inference of discrimination." (citing Johnson, 214 F. App'x at 242)). "Derogatory or negative remarks can also satisfy the fourth prong of a prima facie case . . . ." May v. PNC Bank, 434 F. Supp. 3d 284, 296 (E.D. Pa. 2020) (citing Rossi v. Wyoming Valley Health Care Sys., Civ. A. No. 09-0179, 2010 WL 2766343, at *4 (M.D. Pa. July 13, 2010)).

The Second Amended Complaint does not allege that Hopper or the IBHS Directors treated any employees outside of Plaintiff's protected classes any differently than from Plaintiff with respect to their input in staff meetings, ostracism, the manner in which their work was assigned, or engagement in unethical acts.  The Second Amended Complaint also does not allege that Plaintiff was replaced by someone who is not a member of her protected classes.  Additionally, the Second Amended Complaint fails to allege that any of the negative things that Hopper and the IBHS Directors said about Plaintiff pertained to Plaintiff's race or sex.  Under these circumstances, we conclude that the Second Amended Complaint fails to plausibly allege that Plaintiff's constructive discharge "'occurred under circumstances that could give rise to an inference of intentional discrimination.'"  Mandel, 706 F.3d at 169 (quoting Makky, 541 F.3d at 214).  We

19

therefore grant the Motion to Dismiss with respect to Plaintiff's claim for disparate treatment sex discrimination in violation of Title VII.

        D.        <u>Hostile Work Environment Race and Sex Discrimination in Violation of Title VII</u>

The Supreme Court has held that a hostile work environment exists where "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993) (quoting <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 65, 67 (1986)). To establish a prima facie case of employment discrimination in violation of Title VII due to a hostile work environment, a plaintiff must demonstrate the following five elements: "(1) she suffered intentional discrimination because of her race [or sex]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would have detrimentally affected a reasonable person of the same race [and/or sex] in her position; and (5) there is a basis for employer liability." <u>Letwich v. Sec. United States Dep't of the Treasury</u>, 741 F. App'x 879, 882 (3d Cir. 2018) (setting forth the elements of a hostile work environment claim based on race (citing <u>Aman</u>, 85 F.3d at 1081)); <u>Nitkin v. Main Line Health</u>, 67 F.4th 565, 570 (3d Cir. 2023) (discussing the elements of a hostile work environment claim based on sex (quoting <u>Mandel</u>, 706 F. 3d at 167)). Discrimination is severe or pervasive if it "'alter[s] the conditions of [the victim's] employment and create[s] an abusive working environment.'" <u>Id.</u> (second alteration in original) (quoting <u>Meritor Sav. Bank</u>, 477 U.S. at 67). "The hostility of a work environment must be determined by the totality of the circumstances." <u>Fichter v. AMG Res. Corp.</u>, 528 F. App'x 225, 230 (3d Cir. 2013) (citing <u>Harris</u>, 510 U.S. at 23). "Such circumstances may include 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

20

whether it unreasonably interferes with an employee's work performance.'" Id. (citing Harris, 510 U.S. at 23).

Defendant argues that the Second Amended Complaint fails to allege any facts from which we could infer that Plaintiff suffered intentional discrimination on the basis of her race or sex. As we discussed above in connection with Plaintiff's assertion that she was subjected to constructive discharge, the Second Amended Complaint alleges that, beginning in October 2023 and continuing until Plaintiff resigned, Plaintiff experienced "hostility and unprofessionalism" in connection with her weekly staff meetings with Hopper and the IBHS directors and that Hopper and the IBHS Directors altered Plaintiff's job responsibilities and interfered with Plaintiff's ability to do her job. (See Charge at 4.) However, the Second Amended Complaint fails to allege any facts that might show that Hopper or the IBHS Directors were motivated by animosity towards Plaintiff based on her race or sex. Accordingly, we grant the Motion to Dismiss with respect to Plaintiff's hostile work environment race and sex discrimination claim.

E.    Retaliation

The Second Amended Complaint asserts a claim of retaliation but does not state the statute pursuant to which this claim arises. Since we have determined that Plaintiff's ADA and FMLA claims are time barred, we treat Plaintiff's retaliation claim as arising solely under Title VII. Title VII's antiretaliation provision provides that "an employer may not 'discriminate against' an employee 'because,' among other things, the employee 'has opposed any . . . unlawful employment practice.'" Peifer v. Bd. of Prob. & Parole, 106 F.4th 270, 279 (3d Cir. 2024) (alteration in original) (quoting 42 U.S.C. § 2000e-3(a)). "To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that they were (1) engaged in activity protected by Title VII; (2) the employer took an adverse employment action against them; and (3) there was a causal connection between

their participation in the protected activity and the adverse employment action." Ogilvie v. Summa Glob. Educ., Civ. A. No. 23-4884, 2025 WL 77076, at *2 (E.D. Pa. Jan. 10, 2025) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006)). "Title VII defines a protected activity as an instance where an employee has opposed any practice made unlawful or has made a charge, testified, assisted, or participated in an investigation under Title VII." Wadhwa v. Sec'y, Dep't of Veterans Affs., 505 F. App'x 209, 214 (3d Cir. 2012) (citing 42 U.S.C. § 2000e–3(a)).

The Amended Complaint does not allege that Plaintiff engaged in protected activity under Title VII during the limitations period. Under these circumstances, we conclude that the Second Amended Complaint fails to allege a claim for retaliation in violation of Title VII and we grant the Motion to Dismiss with respect to Plaintiff's retaliation claim.

## IV.    CONCLUSION

For the reasons stated above, we grant the Defendant's Motion to Dismiss in full. However, "in civil rights cases, [we] must offer amendment—irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile." Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 251 (3d Cir. 2007). We find that allowing Plaintiff to amend claims that are based solely on discrete acts that occurred outside of the applicable statutes of limitations would be futile. We thus dismiss Plaintiff's FMLA and ADA claims in their entirety with prejudice because they are based exclusively on discrete acts that occurred prior to October 2023. We also dismiss Plaintiff's Title VII claims with prejudice to the extent that those claims are based on discrete acts that occurred prior to October 2023. However, we are not convinced that amendment of Plaintiff's Title VII disparate impact, hostile work environment, and retaliation claims would be futile to the extent that those claims are based

22

entirely on actions that took place during and after October 2023, and we do not perceive any inequity to permitting amendment of those claims.  We therefore dismiss those claims without prejudice and afford Plaintiff a final opportunity to amend her complaint to state facially plausible Title VII disparate treatment, hostile work environment, and retaliation claims.  An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova

_____

John R. Padova, J.